FILED

09/19/2025

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 12, 2025 Session

## STATE OF TENNESSEE v. WILLIAM EUGENE MOON

**Appeal from the Circuit Court for Coffee County**
**No. 44905F   William A. Lockhart, Judge**

_____

**No. M2024-00268-CCA-R3-CD**

_____

Following a retrial, Defendant, William Eugene Moon, was convicted by a Coffee County jury of attempted second degree murder and employment of a firearm during the commission of or attempt to commit a dangerous felony and sentenced to an effective sixteen-year sentence to serve in the Tennessee Department of Correction.  On appeal, Defendant asserts that the evidence was insufficient to support his convictions; that the trial court erred by failing to instruct the jury on the lesser included offense of attempted voluntary manslaughter; that his trial counsel was ineffective for failing to file a written request for the jury instruction before the jury began its deliberation; that the trial court erred by denying Defendant's motion to suppress his statements; and that Defendant was denied a speedy trial.  Having reviewed the entire record and the arguments of the parties, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, J., joined.  JEFFREY USMAN, Sp. J., filed a separate dissenting opinion.

Drew Justice, Murfreesboro, Tennessee, for the appellant, William Eugene Moon.

Jonathan Skrmetti, Attorney General and Reporter; Garrett D. Ward, Senior Assistant Attorney General; Craig Northcott, District Attorney General, for the appellee, State of Tennessee.

## OPINION

*Procedural History*

Defendant was initially convicted of attempted second degree murder and unlawful employment of a firearm during the commission of or attempt to commit a dangerous felony. Defendant appealed his convictions, and this Court affirmed, holding that the evidence was sufficient to support the convictions, Defendant was not denied the right to a speedy trial, and it was harmless error for the trial court to allow improper impeachment of a defense witness. *State v. Moon*, No. M2019-01865-CCA-R3-CD, 2021 WL 531308, at *1 (Tenn. Crim. App. Feb. 12, 2021), *perm. app. granted* (Tenn. May 13, 2021). The Tennessee Supreme Court granted permission to appeal and agreed with this Court that it was error to allow improper impeachment of a defense witness, but the higher court held the error was not harmless and reversed and vacated the judgments. *State v. Moon*, 644 S.W.3d 72, 74 (Tenn. 2022). Defendant was again convicted of the same offenses after a retrial, and this appeal followed.

*Evidence at Trial*

On December 17, 2017, Tullahoma Police Officer Michael Wilder was patrolling "the east part" of Tullahoma when he observed a vehicle pull into an apartment complex known to have drug activity. Officer Wilder parked his patrol car in a hidden area and observed "numerous people" walking "back and forth" from a nearby trailer park. Officer Wilder decided to "make a loop through the trailer park." He saw several people standing around and noticed one man lower his head and run through the crowd toward "the front entrance of [a] trailer." Officer Wilder asked the "maintenance man," Larry "Chief" Woods, if the man who ran was someone named "Jason." Officer Wilder "remember[ed] there was a guy we had warrants on, and [he] had no idea who it was, but [he] threw a name out there." Mr. Woods answered that the man was "Bill Moon." Officer Wilder recognized Defendant's name because another officer had said he had "a felony warrant out for his arrest[.]"

Officer Wilder called for backup and checked Defendant's information in his system. Officer Wilder then asked Mr. Woods if he could talk to Defendant. Mr. Woods led Officer Wilder to Defendant's trailer. Officer Wilder could see Defendant inside through the "partially open" door. While Officer Wilder waited for another officer to arrive, he engaged Defendant in conversation. Officer Wilder and Defendant heard dispatch verify Defendant's warrant over Officer Wilder's radio, and Defendant said, "I knew I had it[.]" Officer Wilder testified, "at that point, the conversation was still cordial." He asked Defendant to "step out of the trailer" and "sit on the steps." Defendant initially refused but eventually complied.

Defendant asked someone standing nearby for something to drink, and someone handed him "a 40-ounce beer." Defendant asked Officer Wilder if he could drink it, and because Defendant was cooperating, Officer Wilder told him, "Well, I mean, you're about

to go to jail.  It's not that big of a deal.  Just go ahead and take a swig."  Officer Wilder said, "as [Defendant] began to [take a drink], he started to move his mouth a little bit," and Officer Wilder asked if he had something in his mouth.  Defendant "began to turn his lips a little and a baggie c[a]me up, and it looked like a bag of meth[.]"  Officer Wilder "tossed the beer to the side" and "put [his] hand on the right side of [Defendant's] throat[.]"  He testified, "I didn't put my hand around his esophagus or anything like that.  I said, 'Stop.  You don't need to swallow it because it can kill you,' depending on what it's laced with[.]"  Defendant "leaned over" and spit out the baggie.  Defendant started to get up, and Officer Wilder pushed him back down and ordered him to "[s]tay down."  Officer Wilder grabbed Defendant's wrists to restrain him as another officer arrived at the scene.  Defendant told Officer Wilder, "This isn't f[***]ing going to happen.  No, this ain't going to happen."

Officer Wilder testified he felt "a slight movement" and looked down and saw that Defendant had a gun pointed at his torso.  Officer Wilder froze, "expecting the shots to hit [his] vest."  He then grabbed Defendant's pistol and took it "out of battery," which he explained meant to push back the slide so that the gun "may fire or may not fire."  Defendant "trie[d] to roll[,]" and Officer Wilder began "to lose [his] grip on the gun[.]"  Officer Wilder felt the gun "being pulsated" like the trigger was being squeezed.  Officer Wilder attempted to deflect the gun, and Defendant "was torqu[e]ing" the gun back towards him.

While they "wrestl[ed]," Officer Wilder told Defendant, "I'm going to tase you," but Officer Wilder could not draw his taser because they "were too close, and [Defendant] had a gun."  Officer Wilder testified, "[W]ith the gun getting closer to me, all I could feel was that this is over.  If I lose the gun and if I take a shot, you know, it could go either here or not in my vest, so all I could do was try to hold onto the gun at this point, but I was terrified that I was going to die at this point."  Officer Wilder "pushed back" from Defendant, drew his weapon, and began firing at Defendant.

Officer Karl Pyrdom had arrived at the scene.  As he approached, he heard shots being fired.  Officer Wilder yelled for him to "hurry up."  Officer Pyrdom testified, "when I was running up, I could see them coming down the steps.  They were physically locked up in close quarters with each other."

Officer Wilder fired five shots at Defendant, and he "let off the trigger" once he "knew the threat was gone."  Defendant lay "at the bottom of the stairs, [and] the gun was beside him."  Defendant tried to "raise up" but was unable to because of his injuries.  Officer Pyrdom said Defendant "was rolling on the ground[,]" and Defendant's gun was within arm's reach[.]"  Officer Pyrdom grabbed the gun, and law enforcement secured the scene.  The scene was "very chaotic, a lot of yelling" and "screaming" by witnesses.

Officer Wilder attempted to render aid to Defendant, using a blanket to apply pressure to his wounds.

A dashcam recording of the incident was admitted as an exhibit and played for the jury. The video does not show the struggle or the shooting, but Officer Wilder's and Defendant's voices can be heard. After the shooting, Defendant asked Officer Wilder, "Why'd you do that? Why'd you do that?" Officer Wilder responded, "Because you pulled a gun on me." Officer Wilder told another individual nearby, "He spit drugs out, and then he started going for his pockets. And guess what, he pulled a gun out and pointed it right at me." Defendant said, "No, I didn't. No, I didn't." Defendant tried to move, and Officer Wilder told him to stay still while he applied pressure to his wounds. The two then had the following exchange:

> Defendant: Why'd you pull a gun on me? I wasn't going to shoot you, man.
> I never would have. I didn't pull the trigger, did I?
>
> Officer Wilder: Thank God.
>
> Defendant: I wasn't going to. I hope you know that.

The gun retrieved from Defendant, a nine-millimeter handgun, was fully loaded, with twelve rounds in the magazine and one round in the chamber, and the safety was not engaged. The slide was "locked back." On cross-examination, Officer Wilder could not recall whether dispatch said they were "attempting to verify" the warrant or that they had "[h]ard copies in hand."

Tennessee Bureau of Investigation Special Agent Elizabeth Williams was called to investigate the officer-involved shooting. Special Agent Williams did a video walk-through of the scene, took photographs, and collected evidence, including five spent cartridge cases, a 9-millimeter and a .22-caliber live round, and a plastic bag containing a substance that was later tested and confirmed to be .15 grams of methamphetamine.

Defendant's brother, Steven Moon, testified that sometime in October or November of 2017, Officer Wilder "c[a]me looking for [Defendant]'s son." Mr. Moon "figured" Officer Wilder had a warrant for him. Officer Wilder asked if Mr. Moon knew where Defendant was, and Mr. Moon told him he did not know because they were not talking. Officer Wilder said "something about that he would do whatever it takes to get [Defendant] and [his son] off the streets, even if he had to shoot them." Mr. Moon "didn't really think much of it because [he] figured he was just rambling." Mr. Moon did not report the incident to authorities.

- 4 -

Johnny "J.J." Smith was present when Officer Wilder shot Defendant. Mr. Smith was 14 or 15 years old at the time. He saw Defendant go inside the residence and put a gun in his waistband "when the cop arrived[.]" He did not see Defendant pull a gun on Officer Wilder; however, Mr. Smith was standing on the other side of Donald Woods' truck, which obstructed his view of Defendant and Officer Wilder. He said that he did not see Defendant get shot because "[t]he door was blocking [his] way at that point."

Mr. Smith's mother, Miranda Barkve, lived in the same trailer park as Defendant. Ms. Barkve heard "a commotion" and "hollering and screaming." She heard, "Are you going to tase me? Are you going to tase me?" Then she heard gunshots seconds later. She ran towards the incident to check on her son. Ms. Barkve asked her son about the shooting and if it was Defendant's "fault, and [Mr. Smith] automatically said that it wasn't. He said that there was no reason for it to have happened."

Donald Woods was cleaning out his truck when he saw Officer Wilder arrive and ask to speak to Defendant. Defendant stepped out of the trailer and stood on the top step, and Officer Wilder stood on the bottom step. Defendant asked a bystander to hand him a beer. "As soon as [Defendant] got the beer and took the cap off, he threw something in his mouth," which Mr. Woods "assum[ed] was dope – meth[,]" and Office Wilder "grabbed [Defendant] by the throat, telling him to spit it out pretty much, or 'I am going to tase you,' not much of a scuffle there." Officer Wilder then tried to "forcibly sit[]" Defendant down, and Defendant "kind of fell to his side a little bit[.]" Officer Wilder "slipped off of the left side of the steps," and began firing his gun at Defendant. Mr. Woods said "it happened so fast[.]" Mr. Woods did not see Defendant's gun until he saw it on the ground after the shooting occurred.

Defendant testified that he did not intend to kill Officer Wilder during the incident. He went to the trailer park "to see Chief[.]" Defendant had his gun tucked into the waist of his shorts. Defendant said he had a suspended driver's license but testified he did not know he had an outstanding warrant. Officer Wilder did not tell Defendant he had an arrest warrant. Defendant stepped outside onto the porch to talk to Officer Wilder, and the officer "choke[d]" him. Defendant admitted he "had a little baggie of meth in [his] mouth." Defendant "couldn't breathe." Defendant spit out the baggie, and Officer Wilder "jumped backwards and pulled out his gun . . . [and s]tarted shooting." Defendant said his memory of the incident was "not very good." He testified, "Since I got shot, I got dumber." He denied that he pulled his gun or pointed it at Officer Wilder.

The jury convicted Defendant as charged, and the trial court imposed an effective sixteen-year sentence. Defendant filed a motion for new trial, asserting among other issues, that the evidence was insufficient to support his convictions; that the trial court erred by omitting a jury instruction on attempted voluntary manslaughter; that if Defendant waived

the jury instruction, he was entitled to a new trial based on the ineffective assistance of trial counsel; that the trial court erred by denying his motion to suppress his statements to Officer Wilder after the shooting; and that the trial court erred by denying his motion to dismiss for lack of a speedy trial. The trial court denied Defendant's motion after a hearing, and Defendant timely appealed.

## *Sufficiency of the Evidence*

Defendant challenges the sufficiency of the evidence to support both of his convictions. Specifically, Defendant argues there was insufficient proof that he intended to kill Officer Wilder, that he believed his actions would result in Officer Wilder's death, or that he took a substantial step towards killing Officer Wilder. Defendant asserts that the evidence supports a conviction for aggravated assault. He asserts that the evidence is insufficient to support his employment of a firearm conviction because there is insufficient evidence to support his conviction for the predicate felony. The State responds that the evidence was sufficient to support Defendant's convictions.

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *See State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *See State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *See State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

Defendant was convicted of the attempted second degree murder of Officer Wilder and employing a firearm during the commission of a dangerous felony. Second degree murder is the "knowing killing of another." T.C.A. § 39-13-210(a)(1). "A person acts knowingly . . . [when] aware that the conduct is reasonably certain to cause the result." *Id.* § 39-11-302(b). "Whether the defendant acted 'knowingly' is a question of fact for the jury and may be inferred from the surrounding facts and circumstances." *State v. Miller*, 638 S.W.3d 136, 160-161 (Tenn. 2021).

A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense, "[a]cts with intent to complete a course of action or cause a result that would constitute the offense:

> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

T.C.A. § 39-12-101(a).

Tennessee Code Annotated section 39-17-1324 makes it an offense for someone to employ a firearm or antique firearm with the intent to go armed during the commission of or attempt to commit a dangerous felony. T.C.A. § 39-17-1324(b)(1) and (i)(1)(A). Attempted second degree murder is a dangerous felony. *Id.* § -1324(i)(1)(B).

Defendant advances a slightly different argument as to the sufficiency of the evidence in this appeal than he did in the direct appeal of his convictions following his first trial. The evidence from both trials is substantially the same, and in both appeals, Defendant argued there was no evidence that he pulled the trigger. *See Moon*, 2021 WL 531308, at *16, *overruled on other grounds by Moon*, 644 S.W.3d 72. Defendant maintains that because he did not fire the weapon, he did not take a substantial step toward killing Officer Wilder. In his reply brief, Defendant concedes that "a rational jury could find that he pointed a gun" at Officer Wilder; however, Defendant asserts, "it is doubtful that a

rational jury could find any trigger pull at all – and certainly not a trigger pull carried out *while* the gun was pointed at [Officer] Wilder."

Viewed in the light most favorable to the State, the proof at trial showed that Defendant pulled a fully loaded 9-millimeter handgun from his waistband and pointed it at Officer Wilder's lower ribs while Officer Wilder was trying to restrain him and waiting for a backup officer to arrive. Defendant said, "This isn't f-ing going to happen. No, this ain't going to happen." Defendant and Officer Wilder struggled, and Officer Wilder felt Defendant "pulsate" the gun. Defendant squeezed the gun "more than once" during the struggle, indicating he "was trying to pull the trigger" or "deactivate the safety." While they "wrestl[ed]," Officer Wilder felt Defendant "torqu[e]ing [the gun] towards [him], and it was almost right on [him] again." The gun's safety was not engaged when officers retrieved it. In other words, Defendant's gun was fully loaded and kill ready.

Defendant's attempt to isolate the fact that his attempt to pull the trigger was unsuccessful is not persuasive. Based on the proof, a rational juror could reasonably conclude that Defendant acted with the intent to commit a knowing killing. *See Moon*, 2021 WL 531308, at \*17, *rev'd on other grounds by Moon*, 644 S.W.3d 72. Further, a rational jury could conclude that Officer Wilder's description of the gun "being pulsated" like the trigger was being squeezed and Defendant's "torqu[e]ing the gun towards him" during the struggle constituted a substantial step. It is not surprising that bystanders did not see Defendant pull his gun from his waistband or point it at Officer Wilder. It occurred while the two men were struggling with one another, in close physical contact, and the proof showed that their views were obstructed.

Defendant attempts to distinguish *State v. Bradfield*, 973 S.W.2d 937 (Tenn. Crim. App. 1997), in which the defendant pulled a gun from his shoe and, during a struggle for the weapon, told the arresting deputy that he might as well give up because the defendant was going to "shoot [his] ass." *Id*. at 947-48. In affirming the defendant's conviction for attempted first degree murder, we held, "the jury could infer the defendant took a substantial step toward his stated goal, namely shooting the victim. Though not a necessary inference, the jury certainly could have inferred the defendant meant to shoot and kill the victim." *Id*. at 948. Notably, there was no evidence in that case that the defendant pulled the trigger or even attempted to squeeze the trigger, as the evidence in this case showed. Nevertheless, Defendant argues that the facts of this case are distinguishable because Defendant did not threaten to shoot Officer Wilder. However, when Officer Wilder attempted to restrain Defendant, Defendant said, "This isn't f[***]ing going to happen. No, this ain't going to happen" and then pulled a gun from his waistband. Though not an explicit threat, Defendant's statement, taken together with all the other evidence, was sufficient to establish that Defendant acted with intent to commit a knowing killing.

Because we conclude the evidence is sufficient to support the predicate felony, the evidence is also sufficient to support Defendant's conviction for employment of a firearm during the attempt to commit second degree murder. Defendant is not entitled to relief on this issue.

*Lesser-Included Offense Jury Instruction*

Defendant contends the trial court erred by not instructing the jury on the lesser included offense of attempted voluntary manslaughter. The State asserts that Defendant has waived this claim by failing to submit a written request for the instruction before the trial court charged the jury. The State further asserts that Defendant cannot show plain error. Defendant asserts that if the instruction was waived, it was due to the ineffective assistance of trial counsel, which is the same counsel who now represents Defendant on appeal.

"It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Farner*, 66 S.W.3d 188, 204 (Tenn. 2001) (citations omitted). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." *State v. Davenport*, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)).

When a party requests the jury instruction of a lesser included offense "*in writing prior to* the trial judge's instructions to the jury[,] . . . the trial judge shall instruct the jury as to the law of each [lesser-included] offense specifically identified in the request." T.C.A. § 40-18-110(a) (emphasis added). "In the absence of a written request[,] . . . the trial judge may charge the jury on any lesser included offense or offenses, but no party shall be entitled to any lesser included offense charge." *Id*. § -110(b). "[W]hen the defendant fails to request the instruction of a lesser included offense as required by this section, the lesser included offense instruction is waived." *Id*. § -110(c).

After the defense rested, defense counsel orally requested an instruction on attempted voluntary manslaughter, arguing that the proof fairly raised the offense. Specifically, counsel asserted that Defendant "was being choked by the officer," which constituted adequate provocation. The trial court denied the request, finding a "reasonable jury" would conclude that Defendant "knew why he was being choked . . . it wasn't that it was completely and utterly unexpected[.]" The court noted that it was "undisputed that [Defendant] had meth in his mouth and was attempting to swallow it[.]" After the court charged the jury, defense counsel submitted a handwritten note requesting that the trial court include "a lesser-included jury instruction on attempted voluntary manslaughter."

Defendant acknowledges that the written request was not filed before the trial court charged the jury but emphasizes the "writing was filed only 'minutes' after the jury retired."

The State agrees that if Defendant had filed a written request for an instruction on attempted voluntary manslaughter, he would have been entitled to its inclusion. The State argues, however, that Defendant waived the trial court's failure to instruct the jury on the lesser included offense because he failed to comply with the statute requiring the written request be filed before the trial court charged the jury. The State contends the issue is only reviewable for plain error and that Defendant has failed to establish all of the plain error factors.

In Tennessee, an appellate court will grant relief for plain error only if (a) the record clearly establishes what occurred in the trial court; (b) a clear and unequivocal rule of law has been breached; (c) a substantial right of the accused has been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice." *State v. Smith*, 492 S.W.3d 224, 232-33 (Tenn. 2016); *State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (citing *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994)). "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Smith*, 24 S.W.3d at 283. "If any one of these factors is not satisfied, we need not consider the remaining factors." *Smith*, 492 S.W.3d at 232-33 (citing *Smith*, 24 S.W.3d at 283). "When asserting plain error, the defendant bears the burden of persuading the appellate court that the trial court committed plain error and that the error was of sufficient magnitude that it probably changed the outcome of the trial." *Smith*, 492 S.W.3d at 232-33 (citing *State v. Hester*, 324 S.W.3d 1, 56 (Tenn. 2010)).

Ordinarily, we will not review an issue for plain error where a defendant fails to argue the factors in support of such review. Rather than arguing the factors in support of plain error review of the issue, Defendant asserts that his trial counsel was ineffective for failing to timely file a written request to include the jury instruction. Defendant reasons that "ineffective assistance is the easier burden to meet" and that plain error "is a much steeper climb than ineffective assistance." Defendant's initial brief does not address the plain error factors, and his reply brief barely mentions plain error, stating: "[Defendant] will take plain error if he can get it. The only factor(s) that seems up for any plausible debate is the one that the State has contested – substantial right, and/or substantial justice." Defendant then fails to argue that factor, all but conceding the issue.

In any event, Defendant cannot establish that a substantial right was adversely affected or that consideration of the error is necessary to do substantial justice. In order to

establish plain error, Defendant must show a reasonable probability that the result of the trial would have been different—in other words, that a reasonable jury would have convicted him of attempted voluntary manslaughter instead of attempted second degree murder. *State v. Martin*, 505 S.W.3d 492, 505 (Tenn. 2016). "Voluntary manslaughter is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211(a). The distinguishing element between the greater and lesser offenses in this case is whether the offense was committed in a state of passion produced by adequate provocation. *See State v. Williams*, 38 S.W.3d 532, 538 (Tenn. 2001). We must examine the evidence presented at trial, focusing on the strength of the evidence of the distinguishing element and the existence of contradicting evidence of the distinguishing element. *Moore v. State*, 485 S.W.3d 411, 422 (Tenn. 2016).

Defendant asserts that evidence that Officer Wilder "choked him" established adequate provocation. Officer Wilder testified that he "put [his] hand on the right side of [Defendant's] throat" and told him not to swallow the bag of methamphetamine. Officer Wilder said, "I didn't put my hand around his esophagus or anything like that." Officer Wilder testified unequivocally, "I didn't choke the man." He acknowledged that he attempted to cause Defendant "discomfort" by applying pressure to his "Adam's apple." Mr. Smith said he saw Officer Wilder "put his hands on [Defendant]" because he "was trying to get whatever was in [Defendant]'s mouth out." Defendant asserts that "multiple witnesses" testified "that Officer Wilder choked" him; however, the record does not support this assertion. Defendant testified that Officer Wilder "choke[d]" him, and Mr. Woods testified that Officer Wilder "grabbed [Defendant] by the throat." Nevertheless, Officer Wilder warned Defendant not to swallow the substance, and Defendant "lean[ed] over" and "spit[] it right between his legs."

Defendant then began to stand up, and Officer Wilder "push[ed] him back down on the stairs and said, 'No. Stay down.'" Defendant disregarded Officer Wilder's orders and began to get up again. Officer Wilder then grabbed Defendant's wrists and attempted to restrain him. It was at that point that Defendant said, "This isn't f-ing going to happen. No, this ain't going to happen" and pulled a gun from his waistband. Defendant repeatedly tried to stand up, and Officer Wilder prevented him from doing so. Even if the jury believed that Officer Wilder choked Defendant, it is not what immediately preceded Defendant's pulling out his gun. Therefore, Officer Wilder's grabbing Defendant's neck to dislodge the plastic bag filled with the officer thought to be harmful drugs, is not evidence of adequate provocation.

We cannot conclude that a reasonable jury would have convicted Defendant of attempted voluntary manslaughter. We need not address the remaining plain error factors because Defendant has not shown that a substantial right was adversely affected. *See*

*Martin*, 505 S.W.3d at 505 ("The substantial right at issue is a criminal defendant's constitutional right to have the jury instructed on all lesser-included offenses supported by the proof.").

We also reject appellate counsel's attempt to raise an ineffective assistance of counsel claim against himself. Defendant's appellate counsel also represented Defendant at trial, which ordinarily does not present a problem, unless the defendant asserts on appeal that his trial counsel was ineffective. It is well-settled that serving both roles is unethical. In *McCullough v. State*, 144 S.W.3d 382 (Tenn. Crim. App. 2003), this Court specifically held that representing a defendant in a post-conviction proceeding after having represented the defendant on direct appeal created an actual conflict of interests. *Id.* at 385; *see also* Tenn. Sup. Ct. R. 8, RPC 1.7 (explicitly prohibiting a lawyer from representing a client if the representation involves a concurrent conflict of interest); *Frazier v. State*, 303 S.W.3d 674, 682 (Tenn. 2010) (citing RPC 1.7 and noting that "[a] lawyer shall not represent a client if the representation of that client may be materially limited by . . . the lawyer's own interest."). When an attorney is placed in a position of divided loyalty between himself and his client, an actual conflict is created. *McCullough*, 144 S.W.3d at 385.

In his reply brief, Defendant asserts that no actual conflict exists because "counsel has freely admitted his fault." In an affidavit attached to Defendant's motion for new trial, counsel stated that he "did not adequately prepare" and was "relatively unfamiliar" with the statute requiring a written request to be filed prior to the jury charge. Defendant suggests that a remand might be appropriate in order to determine whether Defendant waives any conflict of interest. We deem such an approach unnecessary, having concluded that the trial court's failure to instruct the jury on the lesser included offense does not constitute plain error. *See State v. Pate*, 184 S.W.3d 223 (Tenn. 2006) (holding that the omission of lesser included offense instruction is subject to plain error analysis).

Defendant's attempt to waive any conflict by submitting an affidavit[1] on appeal is improper. "To be effective, the waiver must demonstrate that the client fully understands the nature of the conflict and how it might affect him or her; that the client understands his or her right to the appointment of other counsel if necessary; and that, notwithstanding the potential ill effects, the client desires to proceed with his or her lawyer." *See McCullough*, 144 S.W.3d at 386. For a valid waiver to exist,

---

[1] On February 24, 2025, post briefing and while this matter was awaiting oral argument, counsel for Defendant filed a "Motion To Consider Post-Judgment Facts and To Waive Conflict," complete with an affidavit singed by Defendant claiming to waive "any conflict of interest by [defense counsel]." The motion urges this Court to avoid a remand so as to prevent "further delay" while Defendant "rots in prison." With the filing of this opinion, we deny Defendant's motion.

- 12 -

[The defendant] should (1) be brought into open court[;] (2) be given a full explanation on the record how this matter would affect him; (3) be advised of his right to appointment of other counsel; (4) be questioned under oath by the parties and the ... court to determine his understanding of this matter and waiver; and (5) state under oath whether he desires to waive [the conflict].

*State v. King*, 703 S.W.3d 738, 777 (quoting *Frazier*, 303 S.W.3d at 684). The record does not demonstrate that Defendant was afforded any of these protections. The affidavit submitted on appeal does not serve as a knowing and voluntary waiver of Defendant's right to conflict-free counsel, and we decline Defendant's invitation to remand for the trial court to determine.

Furthermore, we are compelled to restate the precaution that raising such claims on direct appeal is a practice that has been critically questioned by this Court in recent opinions when there is no admissible proof in the record that Defendant's counsel was ineffective. *See State v. Forest*, No. M2017-01126-CCA-R3-CD, 2018 WL 4057813, at *5 (Tenn. Crim. App. Aug. 27, 2018) (Judge John Everett Williams, concurring). This is particularly troubling, at an ethical level, when appellant counsel is making claims of ineffective assistance, against himself as trial counsel. In an apparent attempt to bridge the gap of proof and erase the appearance of ethical issues, Appellant counsel points to his affidavit attached to Defendant's motion for new trial. This affidavit offers no assistance to this Court as we have previously held:

[I]t is well-established that affidavits are generally inadmissible at evidentiary hearings.

An affidavit is ordinarily not admissible to prove facts in issue at an evidentiary hearing, because it is not subject to cross examination and would improperly shift the burden of proof to the adverse party. . . . Affidavits are generally not competent evidence unless provided by statute. . . . As a general rule, a party is not permitted to create an issue of fact by submitting a[n] affidavit whose conclusions contradict a prior deposition or other sworn testimony.

*State v. Blankenship*, No. M2002-01878-CCA-R3-CD, 2004 WL 508500, at *4 (Tenn. Crim. App. Mar. 16, 2004) (quoting 3 Am. Jur. 2d Affidavits § 19 (2002)) (finding appellant's affidavit alleging that the public defender's office had coerced her into pleading guilty failed to fulfill her burden of establishing why her guilty pleas should be withdrawn pursuant to Tennessee Rule of Criminal Procedure 32(f)), *perm. app. denied*, (Tenn. Oct. 11, 2004);

*see also Bartley v. State*, No. E2011-01603-CCA-R3-PC, 2013 WL 967737, at *15 (Tenn. Crim. App. Mar. 11, 2013) (determining the trial court improperly admitted and considered an affidavit as evidence at a post-conviction hearing), *no perm. app. filed*; *State v. Brandon*, No. M2002-00073-CCA-R3-CD, 2002 WL 31373470, at *3 (Tenn. Crim. App. Oct. 15, 2002) (determining affidavits of appellants alleging facts supporting their ineffective assistance of counsel claims failed to fulfill their burden of proving the factual allegations by clear and convincing evidence), *perm. app. denied* (Tenn. Feb. 24, 2003). Furthermore, "affidavits are incapable of credibility assessment, which is oftentimes pivotal in determining ineffective assistance of counsel claims." *Blankenship*, 2004 WL 508500, at *4; *Brandon*, 2002 WL 31373470, at *3.

*Heath v. State*, No. M2016-01906-CCA-R3-PC, 2017 WL 3382804, at *6 (Tenn. Crim. App. Aug. 7, 2017).

Defendant is not entitled to relief on this issue either under plain error review or a *Strickland* styled ineffective assistance of counsel claim.[2] Both attempts fail.

*Motion to Suppress Defendant's Statements*

Defendant asserts that the trial court erred by denying his motion to suppress his statements, arguing that his statements were involuntary and in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). The State responds that the trial court properly denied the motion because Defendant's statements were voluntary and not the product of a custodial interrogation.

Defendant filed a pretrial motion to suppress his statements recorded on the dashcam video. During the hearing, the Defendant agreed that "there was no outright confession here." The State agreed that while the Defendant was in custody, the statements he made were not given during a custodial interrogation. The trial court denied the motion, finding that *Miranda* was not implicated because Defendant was not in custody at the time of his statements, the statements were not against the Defendant's interest, and no interrogation occurred. The court also found that Defendant's statements were voluntary because there was no proof that Defendant "didn't know what he was doing" or "what he was saying," but the court recognized that the voluntariness of Defendant's statements was "a closer call" because Defendant was "in a distressed situation."

---

[2] *See Strickland v. Washington*, 466 U.S. 668, 687 (1984)

- 14 -

This Court is bound by a trial court's findings of fact in a suppression hearing unless the evidence preponderates against such findings. *State v. McKinney*, 669 S.W.3d 753, 764 (Tenn. 2023); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. "The prevailing party 'is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence.'" *McKinney*, 669 S.W.3d at 764 (quoting *State v. Talley*, 307 S.W.3d 723, 729 (Tenn. 2010); *Odom*, 928 S.W.2d at 23). This Court may consider the evidence presented both at the suppression hearing and at trial in evaluating the trial court's ruling on a pretrial motion to suppress. *McKinney*, 669 S.W.3d at 764; *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998). This Court reviews "a trial court's application of law to the facts under a de novo standard of review with no presumption of correctness." *McKinney*, 669 S.W.3d at 764 (citing *State v. Echols*, 382 S.W.3d 266, 277 (Tenn. 2012); *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001)).

The United States and Tennessee Constitutions protect an accused against compelled self-incrimination. U.S. Const. amend. V; Tenn. Const. Art. I, § 9. "[W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." *Miranda*, 384 U.S. at 478. *Miranda* warnings are required only "when a suspect is (1) in custody and (2) subjected to questioning or its functional equivalent." *State v. Moran*, 621 S.W.3d 249, 257 (Tenn. Crim. App. 2020) (citing *State v. Walton*, 41 S.W.3d 75, 83 (Tenn. 2001)). "In the absence of either, *Miranda* requirements are not necessitated." *Id*. (citing *Walton*, 41 S.W.3d at 83).

"The functional equivalent of express questioning refers to 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *State v. Northern*, 262 S.W.3d 741, 750 (Tenn. 2008) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). The relevant inquiry "focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Innis*, 446 U.S. at 301. "A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation." *Id*. "But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." *Id*. at 301-02 (footnotes omitted).

Defendant argues Officer Wilder's "repeated accusations against him in the presence of onlookers" and his applying physical pressure to his wounds while speaking to

- 15 -

him could reasonably be expected to elicit a response.  Defendant likens his case to *Northern*, in which our supreme court held that a twenty-minute conversation between two detectives in the defendant's presence was the functional equivalent of an interrogation because the officers should have known that the conversation was reasonably likely to elicit an incriminating response from the defendant.  *Northern*, 262 S.W.3d at 752-53.  Defendant recognizes that the police in *Northern* "used psychological manipulation with the intent of eliciting a response[;]" whereas, Officer Wilder "was just trying to defend his own honor while vilifying" Defendant.

Defendant asserts, however, that Officer Wilder "carr[ied] on a lengthy conversation about [Defendant]'s guilt in his presence," which "strongly tempted [Defendant] to respond."  The State responds that Officer Wilder's words and actions after the shooting were those "normally attendant to arrest and custody" and not the kind of coercive tactic used by police in *Northern*.  In the dashcam video, which is seven minutes long and as the trial court noted, "very hard to hear," Officer Wilder can be heard repeatedly telling Defendant to "stay where you're at" and reassuring him that an "ambulance [wa]s coming."  Officer Wilder told Defendant he was "leaking out" and that he needed to apply pressure to Defendant's wounds.  Officer Wilder testified that the scene was "very chaotic," and there was "a lot of yelling" and "screaming" by witnesses, which can also be heard on the video.  Defendant cites six times in the recording where Officer Wilder told others present at the scene that Defendant pulled a gun on him.  However, the statements that Defendant sought to suppress, in which he denied that he planned to shoot Officer Wilder, were unprompted and not in response to Officer Wilder's comments.  We conclude that Defendant's statements were not the result of a custodial interrogation, and therefore, *Miranda* was not implicated.

Although we conclude Defendant's statements were not the result of a custodial interrogation, in order to be admissible, the statements must have been voluntarily given.  *See State v. Climer*, 400 S.W.3d 537, 568 (Tenn. Crim. App. 2013) (stating "the voluntariness test remains distinct from *Miranda*").  When evaluating the voluntariness of a statement, "the essential inquiry . . . is whether a suspect's will was overborne so as to render the confession a product of coercion."  *Id*. at 568.

In determining voluntariness, courts must examine "the totality of the circumstances surrounding the giving of a confession, 'both the characteristics of the accused and the details of the interrogation.'"  *Id*. (quoting *Dickerson v. United States*, 530 U.S. 428, 434 (2000)).

> Relevant factors include the age, education, and intelligence of the accused; the extent of previous experience with law enforcement; whether questioning was repetitive and prolonged; the length of the detention prior to giving a

statement; the lack of any advice to the accused of his constitutional rights; whether the accused was injured, intoxicated, drugged, or in ill health; deprivation of food, sleep, or medical attention; and physical abuse or threats of abuse.

*State v. Davidson*, 509 S.W.3d 156, 189 (Tenn. 2016) (citing *Climer*, 400 S.W.3d at 567-68). Courts should also consider: (1) the time and place of the encounter; (2) whether the area was public or secluded; (3) the number of officers present; (4) the degree of hostility; (5) whether the officers displayed weapons; (6) whether the officers requested consent; and (7) whether the suspect initiated contact with the police. *State v. Brown*, 294 S.W.3d 553, 563 (Tenn. 2009).

Defendant asserts that when he made the statements, he was "delirious" and "nearly dead." The parties do not dispute that when Defendant made his statements, he was injured and audibly experiencing a great deal of pain. Regarding Defendant's assertion that his statements were involuntary because Officer Wilder "began applying painful first aid[,]" which Defendant viewed as "further violence" by the officer, Officer Wilder repeatedly explained the purpose of his actions to Defendant while acknowledging Defendant's pain.

The trial court found that Defendant was "in a distressed situation" but that there was no evidence that he was unaware of what he was saying. Defendant asserts that his denying that he tried "to *shoot* the officer" rather than denying that he drew the gun at all is further evidence that Defendant was "not in his right mind[.]" However, we agree with the State that Defendant's inability to "articulate a more coherent legal defense" at that time does not demonstrate that his "will was overborne so as to render the confession a product of coercion." *See Climer*, 400 S.W.3d at 568.

Defendant's statements were cogent and coherent. There was no proof to suggest that Defendant's wounds caused him cognitive impairment other than his testimony at trial that since the shooting, he had "got[ten] dumber." The interaction was clearly in public as several bystanders can be seen watching the incident. It is unclear how many officers besides Officers Wilder and Pyrdom were at the scene, but Defendant's unprompted statements appeared to be directed solely at Officer Wilder. The degree of hostility had lessened at the time of the statements and Officer Wilder was speaking calmly to Defendant while he administered aid. There was no proof as to Defendant's age, education, intelligence, or experience with law enforcement.

Considering the totality of the circumstances, we cannot conclude that Defendant's statements were involuntary or that his "will was overborne so as to render the confession a product of coercion." *See id*. The trial court did not err in denying Defendant's motion to suppress. Defendant is not entitled to relief on this issue.

*Speedy Trial*

Defendant contends the trial court erred by not granting his motion to dismiss the indictment based on the denial of his right to a speedy trial. The State argues the length of the delay did not trigger a speedy trial analysis, that there were sufficient reasons necessitating the delay, and the delay did not result in prejudice. We agree with the State.

The supreme court's opinion reversing Defendant's convictions was filed on April 20, 2022. Defendant's second trial began eleven months later on March 27, 2023. The trial had been set for November 29, 2022, but the State filed a motion to reset on August 30, 2022, because the victim was unavailable. On March 15, 2023, Defendant filed a motion to dismiss for lack of a speedy trial. At a hearing on Defendant's motion to dismiss, defense counsel conceded that the court should not consider post-trial time between Defendant's original convictions and the supreme court's reversal. However, defense counsel argued that the delay should include the approximate thirteen-month period between his arrest and the start of his first trial, even though the supreme court analyzed Defendant's speedy trial claim and held he was not denied the right to a speedy trial.[3] Defense counsel argued a "25-month delay" was excessive in this case, which he characterized as "a garden-variety street crime." The State argued the clock did not start running until mandate issued on the Tennessee Supreme Court's opinion reversing Defendant's conviction.

Citing a lack of "clear guidance," the trial court exercised "an abundance of caution" and analyzed both delays. The court denied Defendant's motion, finding that the State did not intentionally cause the delay, that the delay "wasn't very long," and that while Defendant made demands for a speedy trial, "there was no proof" Defendant was prejudiced by the delay.

Once the State initiates criminal proceedings, the right to a speedy trial is implicated pursuant to the Sixth Amendment to the United States Constitution and to article I, section 9 of the Tennessee Constitution. *See* Tenn. Code Ann. § 40-14-101; Tenn. R. Crim. P. 48(b). In *Barker v. Wingo*, 407 U.S. 514, 530 (1972), the Supreme Court devised a balancing test to determine speedy trial issues and identified the following factors for consideration: (1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of this right to a speedy trial; and (4) the prejudice to the defendant. *See also State v. Bishop*, 493 S.W.2d 81, 84-85 (Tenn. 1973) (implicitly adopting the *Barker*

---

[3] In its opinion, the supreme court analyzed the factors articulated in *Barker v. Wingo*, 407 U.S. 514 (1972), and determined the only factor that weighed in favor of Defendant was his request for a speedy trial. *Moon*, 644 S.W.3d at 80.

balancing test for our State's constitutional and statutory right to a speedy trial). Generally, "a delay must approach one year to trigger the [*Barker*] analysis," although "the line of demarcation depends on the nature of the case." *State v. Utley*, 956 S.W.2d 489, 494 (Tenn. 1997); see *Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992).

This Court has recognized that "[a] defendant's right to a speedy trial attaches anew on the date on which his original conviction is reversed following a successful appeal or collateral attack." *State v. Rickman*, No. W1999-01744-CCA-R3-CD, 2002 WL 35667898, at *26 (citing *State v. Harris*, 978 S.W.2d 109, 113 (Tenn. Crim. App. 1997)). Thus, the relevant period of delay in this case is the eleven-month period between the Tennessee Supreme Court's decision reversing Defendant's convictions and the beginning of his new trial.

Although a delay of less than one year is not presumptively prejudicial, a review of the *Barker v. Wingo* factors nevertheless leads us to conclude that Defendant has not suffered a violation of his right to a speedy trial. As in Defendant's first trial, he asserted his right to a speedy trial, which weighs in his favor. The reason for the delay was because "the victim who is the [State's] primary witness . . . had a previously planned vacation that ha[d] been paid for and scheduled for some time." Although the delay was at the request of the State, we agree with the trial court that it was unintentional. We further agree with the trial court that Defendant has not shown any prejudice caused by the delay. Defendant testified briefly at the hearing on his motion that his incarceration had caused him depression for which he was prescribed medication. Absent unusual or egregious circumstances, however, we will not weigh pretrial anxiety and concern in a defendant's favor. *See Moon*, 644 S.W.3d at 80. The trial court properly denied Defendant's motion to dismiss. He is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing authorities and analysis, we affirm the judgments of the trial court.

S/Timothy L. Easter
TIMOTHY L. EASTER, JUDGE

- 19 -